**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KESHAUNTA KELLY,**<br><br>        **Plaintiff,**<br><br>        v.<br><br>**UNITED ROAD TOWING SERVICE,<br>INC., a/k/a E & R TOWING,**<br><br>        **Defendant.** | **Case No. 07 C 6790**<br><br>**Hon. Harry D. Leinenweber** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keshaunta Kelly (hereinafter, "Kelly") brings this action against Defendant United Road Towing Service, Inc. (hereinafter, "URT") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* In her Complaint, Kelly seeks to hold URT liable for sexual harassment for subjecting her to a hostile work environment and for retaliation for engaging in a protected activity. Presently before the Court is URT's Motion for Summary Judgment on both claims. For the following reasons, the Motion is granted in part and denied in part.

### I. FACTS

#### A. Kelly's Employment at URT

URT provides impound services pursuant to contract with the City of Chicago and operates Auto Pound Six in Chicago. Def.'s Statement of Facts ("Def.'s SOF") ¶ 4. From October 27, 2006 to January 3, 2007, Kelly was employed by URT as a data entry clerk and as an

undercover "mole" at Pound Six. *Id.* at ¶¶ 5, 6, 12. Kelly's duties as a clerk included administrative work, processing computerized data, and soliciting and reviewing information from vehicle owners. *Id.* at ¶¶ 8-9. In her role as an undercover mole, Kelly worked independently, investigating employee theft and reporting to management. *Id.* at ¶ 12. Kelly initially worked the overnight shift (12:00 a.m. to 7:00 a.m.). *Id.* at ¶ 13. About four nights per week, Bernard Kimble ("Kimble") was Kelly's supervisor, and one night per week, Sunette Hampton ("Hampton") was her supervisor. Kelly Dep. 95-97.

**B. Kelly's Report of Harassment and URT's Response**

Shortly after Kelly started her job at URT, Kimble began to engage in inappropriate behavior toward her. During this time, Kimble was training Kelly on her duties as a clerk in the back area of the office, and the two were often alone together. *See* Pl.'s Statement of Facts ("Pl.'s SOF") ¶ 7. On multiple occasions, without Kelly's consent, Kimble massaged her shoulders and made sexual comments, including that he: "[had] something better than that," "had something else soft," or "could give her something that [would] feel much better than that." *Id.* at ¶ 9; Kelly Dep. 106-114, 120-123. When Kelly asked Kimble to stop touching her, he stopped. Kelly Dep. 107-108, 113, 120-123. On one occasion, Kimble told Kelly that he had a "polish" for her. *Id.* at 114-118. Kimble also responded with sexual innuendo to Kelly's work-related questions and

asked her out on dates, which she refused. *Id.* at 118-123. These incidents took place within a two-week time period. *Id.* Kimble's comments and conduct made Kelly feel uncomfortable, and she feared that she would lose her job if she complained. Pl.'s SOF ¶¶ at 13, 15.

On November 17, 2006, Kelly told Hampton and another shift supervisor, Anne Zelensky ("Zelensky"), that Kimble touched her inappropriately and made sexual comments to her. Kelly Dep. 119-120; Hampton Dep. 33-39. The same day, Hampton and Zelensky submitted written incident reports to Amber Tawlks ("Tawlks"), the Operations Manager at Pound Six. *See* Pl.'s Ex. F (Hampton's Incident Report); Pl.'s Ex. N (Zelensky's Incident Report). The reports listed Kelly's allegations that Kimble rubbed her shoulders without her permission and made sexual comments to her on multiple occasions. *Id.* At Hampton's request, Kelly wrote a letter to Tawlks, explaining that Kimble made sexual comments toward her that made her uncomfortable and asking that Tawlks call her to discuss the situation. Kelly Dep. 126-128; Pl.'s Ex Q (Letter from Kelly to Tawlks). In another letter to Tawlks dated November 18, 2006, Kelly stated that she wanted Kimble's behavior to stop, but that she did not want to cause trouble or to sue URT. *See* Pl.'s Ex. H (November 18, 2006 Letter from Kelly to Tawlks). Kelly wrote the second letter because she feared that her managers did not believe her complaint and that she might lose her job. *See* Kelly Dep. 131-136.

Once notified of Kelly's allegations, Tawlks informed her manager, David Corcoran ("Corcoran"), and began to investigate the claims. Tawlks Dep. 58-60. During the next few days, Tawlks interviewed Kelly and spoke to Kimble, who admitted to rubbing Kelly's shoulders but only did so at Kelly's request, and denied making any inappropriate remarks. *Id.*; Pl.'s Ex. T (November 17, 2006 Letter from Kimble). Tawlks also asked all other employees on Kelly's shift, and incident reports were collected from 26 URT employees regarding whether each employee had witnessed anything inappropriate between Kelly and Kimble. Hampton Dep. 42-47; Def.'s Ex. I (URT Incident Reports). After the investigation, which took about one day, URT management determined that Kimble had sexually harassed Kelly by touching her without her permission. Corcoran Dep. 50-53. Kimble was suspended without pay for three days. Def.'s SOF ¶ 29.

On November 20, 2006, Kelly signed a statement, acknowledging Kimble's suspension and that she was offered, but refused, the option of transferring to a different shift. Pl.'s Ex. K (November 20, 2006 Statement). Kelly was provided a contact number and a procedure to follow if any employee attempted to retaliate against her for her complaint. *Id.* During the rest of her tenure at URT, Kelly worked with Kimble on about three occasions, and Kimble did not harass her at any time. Def.'s SOF ¶¶ 34, 36.

At some point after she reported Kimble's misconduct, Kelly requested that she be transferred from work in the back office to customer service duties in the front office. Kelly Dep. 73-81. Kelly's request was granted the same day. *Id.* URT also granted Kelly's request to switch from the overnight shift to the third shift (3:00 p.m. t 12:00 a.m.). *Id.*

After Kelly's complaint about Kimble, several co-workers snubbed and harassed her, calling her a "snitch," a "ho," and a "trick," spitting on her car, and giving her bad looks. Pl.'s SOF ¶ 25; Kelly Dep. 153-158. Kelly reported one such incident to her supervisor, and that employee's behavior ceased. Kelly Dep. 157-158. According to Kelly, her supervisors had knowledge about this behavior, but they did not participate in it. *Id.*

URT has a written policy on sexual harassment, included in the Employee Handbook which is given to each new employee. Def.'s SOF ¶¶ 48-50; Kelly Dep. Ex. 7 (URT Employee Handbook). The policy defines sexual harassment, lists examples of prohibited conduct, and provides a procedure through which to report grievances. *Id.* All new URT employees are required to sign an acknowledgment that they have received and reviewed the policy. *Id.* Both Kelly and Kimble signed this acknowledgment. Def.'s SOF at ¶¶ 51-52.

### C. Kelly's Termination

In late December 2006 and early January 2007, URT received two customer complaints about Kelly. In late December 2006, URT received

a notice from the City of Chicago that a complaint had been lodged against Kelly for rude behavior toward a customer. Corcoran Dep. 84-87. On or about January 3, 2007, URT's General Manager, Joe Braverman ("Braverman"), visited Pound Six and observed Kelly acting in a rude and unprofessional manner toward a customer. Braverman Aff. ¶¶ 7-8. Kelly disputes that this incident occurred, and avers that she was not even working on January 3. Pl.'s SOF ¶¶ 29-30. The same day, which URT emphasizes was "on or about January 3," after seeing a letter from a customer complaining that Kelly was rude and discourteous, *see* Braverman Aff. ¶¶ 7-11, Ex. A-1 (January 3, 2007 Complaint), Braverman recommended that Tawlks fire Kelly because of her behavior toward customers. Braverman Aff. ¶¶ 10-11. On January 3, 2007, Kelly was notified that her employment with URT was terminated. Pl.'s Ex. W (January 3, 2007 Termination Notice). URT's stated reason for termination was that Kelly violated company policy and procedures. *Id.* URT management testified that Kelly was fired because of her discourteous attitude toward customers. *See* Tawlks Dep. 50-52; Tawlks Ex. 18; Braverman Aff. ¶¶ 9-11; Braverman Dep. 29-32.

In general, URT uses a progressive discipline policy with its employees, beginning with warnings, then suspension, probation, and termination. The progressive discipline policy is not employed in call cases of misconduct, and employees can be terminated in the

absence of multi-step discipline. Tawlks Dep. at 13-16; Corcoran Dep. 34-35.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir., 2000). The adverse party, however, may not rest upon the mere allegations or denials in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial, if appropriate, shall be entered against the adverse party." FED. R. CIV. P. 56(e).

## III. <u>DISCUSSION</u>

### A. Hostile Work Environment

URT argues that it is entitled to summary judgment on Kelly's hostile work environment claim because the record does not show that

Kelly was subject to a severe, pervasive environment or that URT was negligent in failing to prevent or remedy any harassment.

Title VII protects employees against being subjected to a workplace so permeated with harassment on the basis of sex that the conditions of employment are altered and a hostile work environment is created. *Patton v. Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir., 2006). A work environment is hostile for purposes of Title VII if it is "both objectively and subjectively offensive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). To maintain an actionable claim, an employee must demonstrate that a supervisor or co-worker harassed her because of her sex and that the harassment was sufficiently "severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). To determine whether harassment rises to the level of a hostile work environment, courts consider a variety of factors, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 532 U.S. at 787-88.

The Seventh Circuit has provided further guidance on how to evaluate the severity of harassment, distinguishing between "the merely vulgar and mildly offensive" and "the deeply offensive and sexually harassing." *Hostetler v. Quality Dining, Inc.*, 218 F.3d

798, 807 (7th Cir., 2000); *Patton*, 455 F.3d at 816. On one side of the line are sexual assaults, other physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures. *Id.* On the other side of the line lies conduct that generally does not create a hostile work environment, such as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish works." *Patton*, 455 F.3d at 816. Although in rare cases, one severe act of harassment may create a hostile work environment, actionable harassment generally involves a combination of severity and frequency of incidents creating an environment that a reasonable person would find intolerable. *See id.*

Both physical and verbal harassment lie along a continuum, and "[t]he mere existence of physical contact does not create a hostile environment." *Id.* at 816. However, "when the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." *Id.* (finding a supervisor's groping an employee under her shorts sufficient for a hostile environment claim); *see, e.g., Hilt-Dyson*, 282 F.3d 463-64 (supervisor's rubbing of back and shoulders, which ceased after plaintiff complained, insufficient); *Hostetler*, 218 F.3d at 808-09 (coworker's forcible kiss and attempt to undress an employee sufficient); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d

333, 337 (7th Cir., 1993) (two attempts by a supervisor to kiss the plaintiff insufficient).

The conduct alleged in this case occurred over the course of approximately two weeks and consisted of (1) physical contact, and (2) sexually charged comments. Specifically, Kelly alleges that, on multiple occasions, Kimble rubber her shoulders without her consent until she asked him to stop. Kimble asked Kelly out on dates and made inappropriate sexual comments toward her.

The record is clear and URT does not contest that Kelly subjectively considered her work environment to be hostile. The Court finds, however, that although Kimble's alleged conduct was inappropriate, it was not so severe or pervasive as to create an objectively hostile work environment. While any employee in Kelly's position might have experienced significant discomfort as a result of her supervisor's unwelcome advances, Kimble's offensive behavior simply did not rise to the level of pervasive harassment as required by Title VII. *See Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir. 1993); *see, e.g., Weiss*, 990 F.2d at 337 (no actionable harassment where supervisor asked employee out on dates, called her a 'dumb blond,' placed his hand on her shoulder several times, and attempted to kiss her on multiple occasions). The incidents alleged in this case were few in number and were not threatening or severe in nature. As noted above, the only physical contact alleged involved instances in which Kimble rubbed Kelly's shoulders without her

permission until she asked him to stop.  The offensive comments, while inappropriate, were not sexual solicitations or threatening in nature.  Kimble's comments were simply "petty vulgarities with the potential to annoy but not to objectively transform the workplace, and they epitomize the vulgar banter of coarse or boorish workers that Title VII does not reach." *E.E.O.C. v. Caterpillar, Inc.*, 503 F.Supp.2d 995, 1046 (N.D.Ill., 2007).  When Kelly reported these incidents to URT management, Kimble stopped touching her and making offensive remarks.  Further, Kelly has not demonstrated that Kimble's harassment interfered with her work performance at URT.

Kelly also alleges that coworkers harassed her after learning about her complaint of sexual harassment.  Kelly's coworkers spit on her car, called her offensive names, and snubbed her.  The Court finds that this harassment does not give rise to an actionable hostile work environment claim under Title VII.  The law is clear that Title VII "does not set forth a general civility code for the American workplace," and "personality conflicts at work that generate antipathy" and "snubbing by coworkers fall outside the purview of Title VII.  *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

The Court finds that Kelly has failed to demonstrate a *prima facie* case of sexual harassment - retaliation under Title VII.  *See Saxton*, 10 F.3d at 533 ("[R]elatively isolated instances of non-severe misconduct" are insufficient to support a hostile environment

claim.).  The Court, therefore, grants summary judgment to URT on Count I.

## B. Retaliation

In Count II, Kelly alleges that she was discharged in retaliation for complaining about Kimble's harassment.  URT argues that it is entitled to summary judgment on this claim because Kelly has failed to set forth a *prima facie* case of retaliation and cannot establish that its reasons for firing her are pretext.

Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made an unlawful employment practice by this subchapter or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing"under the statue.  *See* 42 U.S.C. ¶ 2000e-3(a).  To demonstrate a claim for retaliation, an employee may present direct or indirect evidence of the employee's retaliatory intent. *Hilt-Dyson*, 282 F.3d 465.

In this case, Kelly proceeds using the indirect method of proof. Under this method, an employee must show that:  (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; and (3) despite meeting these expectations, she suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  *Id.*  If the employee makes out a *prima facie* case, the

employer must offer a legitimate, noninvidious reason for the adverse employment action. *Id.* The burden then shifts back to the employee to demonstrate the employer's proffered reason was pretext. *Id.* At this point, if the employee fails to establish pretext, the retaliation claim cannot survive summary judgment. *Id.*

### 1. *Prima Facie Case of Retaliation*

Kelly clearly satisfies the first and third requirements of her *prima facie* case. On November 15, 2006, Kelly complained that her supervisor was sexually harassing her. On January 3, 2007, she was terminated. The parties dispute, however, whether Kelly has shown that she was meeting URT's legitimate expectations and whether she was treated less favorably than similarly situated employees who did not engage in protected activity.

#### a. *Legitimate Expectations*

URT first argues that Kelly has not met her burden of showing that she was meeting its legitimate expectations. In Kelly's position as a clerk, URT expected her to interact with vehicle owners in a professional and courteous manner. Zelensky Dep. 52-53. Employees are subject to discipline if they act rudely toward customers. *Id.;* Tawlks Dep. 14-16. During the week before Kelly was fired, URT received two customer complaints about her rude behavior. *See* Corcoran Dep. 84-87. During the same time period, Braverman, URT's General Manager, testified that he personally observed Kelly acting rudely to a customer. Braverman Aff. ¶¶ 7-9.

Kelly argues that customer complaints are common at URT, and the fact that complaints were lodged against her does not prove that she was not doing her job or that she was rude to customers. As evidenced by the record, URT, a towing company, receives multiple customer complaints per week and does not discipline its employees for each complaint. Pl.'s SOF ¶ 35. Kelly contends that URT did not investigate either complaint and that the incident with a customer that Braverman allegedly witnessed did not occur, evidenced by the fact that Kelly did not work on January 3, 2007. Finally, Kelly notes that she did not receive any discipline, written reprimands, or suspensions prior to her termination.

Viewing the evidence in the light most favorable to Kelly, as it must, the Court finds that a reasonable jury could find that Kelly was meeting URT's legitimate expectations. The Court notes that, in employment discrimination cases, it is sometimes appropriate to give little consideration to the job performance issue and focus instead on the issue of pretext because, in these cases, the employer maintains that the discharge was based on its reasonable belief that the employee was not performing satisfactorily. *See Vanasco v. National-Louis University*, 137 F.3d 962, 966 (7th Cir. 1998). Although URT has presented evidence that customers complained about Kelly and that its manager observed her treating a customer rudely, a reasonable jury could still find that Kelly was performing her work satisfactorily.

### b. *Treatment of Similarly Situated Employees*

URT next argues that Kelly failed to establish that she was treated less favorably that similarly situated employees. Kelly submits URT records showing that other employees, who had customer complaints lodged against them but who did not complain of harassment, were not disciplined or terminated. *See* Pl.'s Ex. R (URT personnel files). Kelly argues that the records show that: (1) 25 employees with complaints were not disciplined, and (2) eight employees with multiple complaints were not disciplined or terminated. For example, one URT supervisor, accused by customers of yelling, throwing paper, and threatening bodily harm, has had nine complaints filed against her and no resulting discipline. *See* Pl.'s SOF ¶¶ 35-38. Two other data clerks had three or four customer complaints and no resulting discipline. *Id.*

URT argues that Kelly cherry-picked employee records and that she had not shown that URT treated her less favorably than other employees. First, URT notes that Kelly's situation differed from mere customer complaints because its General Manager personally observed her interacting discourteously with a customer. URT also argues that Kelly did not compare her situation to similarly situated employees. According to URT, new employees, such as Kelly, are subject to enhanced scrutiny, and the employees identified in Kelly's brief were employed by URT for longer periods of time. Finally, URT points to its employment records that show three similarly situated

employees were terminated on the basis of rudeness to customers. *See* Pl.'s Ex. R-2 (URT records).

Viewing the record in the light most favorable to Kelly, the Court finds that material questions of fact exist as to whether URT treated Kelly less favorably than similarly situated employees. The Court, therefore, finds that Kelly has established a *prima facie* case of retaliation.

### *2. Pretext*

Finally, the record shows that a reasonable jury could determine that URT's proffered reasons for terminating Kelly were pretext. In retaliation claims, a plaintiff can establish pretext either by "rais[ing] a genuine issue of material fact about an employer's credibility by presenting evidence that the employer's explanation was contrary to the facts, insufficient to justify the action or not truly the employer's motivation." *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir., 2006). To survive a motion for summary judgment, the plaintiff needs only offer evidence that supports an inference that the employer's nondiscriminatory reason for its action was dishonest. *Id.*

URT's stated reason for Kelly's termination was that she violated company policies and procedures by treating customers rudely. Among other arguments, Kelly contends that a reasonable jury would question URT's credibility because: (1) Kelly was not given a written reprimand, suspended, or otherwise disciplined prior to

termination; (2) questions exist as to whether Braverman observed her treating a customer rudely on or about January 3, 2007; and (3) URT has not disciplined or terminated similarly situated employees who had multiple customer complaints lodged against them.

The Court finds that Kelly has raised issues of material fact as to the credibility of URT's proffered reason for her termination. A reasonable jury could find that URT's reason was insufficient to justify Kelly's termination and that URT terminated Kelly instead in retaliation for her complaint. *See, Target*, 460 F.3d at 960. Thus, URT is not entitled to summary judgment on Count II.

### C.  Punitive Damages

Finally, URT contends that Kelly is not entitled to punitive damages because it made good faith efforts to comply with Title VII and because no reasonable jury could conclude that it acted with malice or reckless indifference to Kelly's federally protected rights. *See* 42 U.S.C. § 1981a(b)(1); *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 528 (1999). The Court finds that URT is not entitled to summary judgment on this issue. Material issues exist as to whether URT actively enforced its harassment policy and whether it intentionally terminated Kelly in retaliation for her complaint.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, URT's Motion for Summary Judgment is granted in part and denied in part. The Court grants Summary

Judgment to URT on Count I (sexual harassment - hostile work environment), but denies Summary Judgment on Count II (retaliation).

**IT IS SO ORDERED.**

                                                Harry D. Leinenweber, Judge
                                                United States District Court

**DATE:**    3/12/2009